## IN THE UNITED STATES DISTRICT COURT
## FOR THE SOUTHERN DISTRICT OF ILLINOIS

| | |
|---|---|
| **LAUNIUS MARKETING SPECIALISTS, INC.,** | ) <br> ) <br> ) |
| **Plaintiff,** | ) <br> ) <br> ) |
| **v.** | ) **Case No. 3:15-cv-1042** <br> ) |
| **DAVID PEPPER** <br> Serve at: <br>     **203 S. Jefferson** <br>     **Millstadt, IL 62260** | ) <br> ) <br> ) <br> ) <br> ) |
| **and** | ) <br> ) |
| **APEX SALES & MARKETING, INC.** <br> Serve at: <br>     **Barry D. Dix, Registered Agent** <br>     **5111 West Main Street** <br>     **Belleville, IL 62226** | ) <br> ) <br> ) <br> ) <br> ) <br> ) <br> ) <br> ) |
| **Defendants.** | ) |

## VERIFIED COMPLAINT

Plaintiff Launius Marketing Specialists, Inc. ("LMS"), brings this action against Defendants David Pepper ("Pepper") and Apex Sales & Marketing, Inc. ("Apex") for violation of the Computer Fraud and Abuse Act, breach of Illinois Trade Secrets Act, breach of duty of loyalty, tortious interference with contract or business expectancy, and violation of the Illinois Uniform Trade Practices Act. In support thereof, LMS states as follows:

## NATURE OF CASE

1.    This is an action based on violations of the Computer Fraud and Abuse Act, 18 U.S.C. §§ 1030, *et seq.* ("CFAA"), the Illinois Trade Secrets Act, continued breach of duty of loyalty to LMS, intentionally and tortiously interfering with LMS's contract or business

expectancies, and violations of the Illinois Uniform Deceptive Trade Practices Act, to seek judgment against Pepper, an award of compensatory damages in an amount to be proven, as well as punitive damages, to enjoin Pepper and Apex from intentionally violating the law and prevent further violations of law, and prejudgment interest, costs, and attorneys' fees.

2.      Defendant Pepper was previously employed as a sales representative by Plaintiff LMS.

3.      Through his employment with LMS, Pepper learned LMS's confidential and proprietary information, including information concerning pricing agreements, policies, promotions and discount agreements between LMS's manufacturer clients and wholesale customers, information concerning LMS's manufacturer clients' and wholesale customers' particular needs, preferences and interests (and how LMS uses such information to maintain a competitive advantage), marketing plans, business strategies, financial information, profit and margins.

4.      This information constitutes "trade secrets" under Illinois law. This information is not known outside of LMS, and LMS derives a competitive advantage by keeping this information confidential. LMS takes reasonable steps to safeguard the confidentiality of this information by restricting access to only those employees who require the information to perform their job duties.

5.      Recently, Pepper voluntarily resigned from his employment with LMS and began his own business, Defendant Apex, in Millstadt, Illinois and directly competing with LMS as a commission-based sales agency in the areas of Southern Illinois, Missouri, Iowa, Nebraska, and Kansas.

6.      As set forth *infra*, Pepper and/or Apex have violated the Illinois Trade Secrets Act by using and/or inevitably using or disclosing LMS's trade secret information to compete with LMS, Pepper has breached his duty of loyalty to LMS and tortiously interfered with LMS's contract or business expectancies by directly competing with LMS prior to his resignation by soliciting and/or actually inducing LMS's existing clients to sever contracts or cease doing business with LMS in order to do business with his new company, Apex, violated the Computer Fraud and Abuse Act under federal law through the unauthorized access of LMS's computer databases and files, and violated the Illinois Uniform Deceptive Trade Practices Act by taking actions which created a likelihood of confusion or misunderstanding as to the nature of his services.

7.      LMS attempted to resolve this matter by sending Pepper a letter request he cease and desist **(see Exhibit A, attached hereto)**; however, Pepper has refused to acknowledge his actions are in violation of the law and demonstrated an unwillingness to preserve the confidentiality of LMS's trade secrets **(see Exhibit B, attached hereto)**.

## PARTIES

8.      LMS is a business incorporated under the laws of the State of Illinois with its principal place of business at 100 E. Laurel St. in Millstadt, Illinois, with interstate operations in the areas of Southern Illinois, and states of Missouri, Iowa, Nebraska, and Kansas both in-person and through the use of computers.

9.      Pepper is a citizen of the State of Illinois residing at 203 S. Jefferson in Millstadt, Illinois.

10.     Defendant Apex is a business incorporated under the laws of the State of Illinois, with its principal place of business at 203 S. Jefferson in Millstadt, Illinois, and its registered agent at 5111 West Main Street in Belleville, Illinois.

## JURISDICTION AND VENUE

11.     This Court has jurisdiction over the parties in this action pursuant to 28 U.S.C. § 1331 as it is a civil action arising under the laws of the United States, specifically the CFAA, 18 U.S.C. §§ 1030, *et seq.*

12.     Venue is proper in this judicial district pursuant to 28 U.S.C. §1391(b)(2) as a substantial portion of the events or omissions giving rise to the claims occurred in this judicial district.

## FACTS COMMON TO ALL COUNTS

13.     LMS is a commissioned-based sales agency specializing in automotive and industrial tools and equipment based in Millstadt, Illinois, and serving the areas of Southern Illinois, Missouri, Iowa, Nebraska, and Kansas; LMS operates through both in-person sales and conducts business via telephone and through the use of computers, email servers and network throughout its territory. **(See Exhibit C, Affidavit of William E. Launius, attached hereto, at ¶ 2).**

14.     LMS is owned and operated by William E. Launius, Sr. ("Launius") and currently employs an office manager and receptionist, Lori Harris ("Harris"), as well as a part-time bookkeeper. **(See Exhibit C, at ¶ 3).**

## LMS's Relationship With Clients And Customers

15.     LMS has represented various automotive parts and products manufacturers in the territories of Southern Illinois, Missouri, Iowa, Nebraska, and Kansas since 1979. **(See Exhibit C, at ¶ 4).**

16.     LMS functions as the exclusive sales representative for several manufacturer clients, selling and marketing their products to various wholesale customers in the automotive and industrial business. **(See Exhibit C, at ¶ 5).**

17.     By way of example, LMS has been the exclusive representative of Jenny Products Inc. ("Jenny") among others, in the areas of Southern Illinois, Missouri, Iowa, Nebraska, and Kansas for approximately twenty-five (25) years, selling and marketing Jenny's products to customers through automotive parts retail customers, such as O'Reilly Automotive ("O'Reilly"). **(See Exhibit C, at ¶ 6).**

18.     LMS negotiates pricing agreements between its manufacturer clients and wholesale customers, handles customer orders and purchases, and pricing policies, promotions and discounts, among other matters, generating revenue through commissions earned from the sale of LMS's manufacturer client's products through wholesale customers' retail outlets. **(See Exhibit C, at ¶ 7).**

19.     This information is highly confidential and any release of this proprietary information to competitors would directly harm LMS, its manufacturer clients, and its wholesale customers. **(See Exhibit C, at ¶ 8).**

20.     LMS's competitors are any of its manufacturer clients' competitors, as well as other sales and marketing agencies that operate in direct competition with LMS's product lines. **(See Exhibit C, at ¶ 9).**

21.     Should a competing manufacturer, or a competing sales and marketing agency, gain access to confidential pricing agreements, policies, promotions or discounts, customer orders and purchases, or other confidential information, that information can be used to underbid LMS and its manufacturer clients.  **(See Exhibit C, at ¶ 10).**

22.     Because of this very competitive environment, information regarding LMS's profit margins and pricing models can give a competitor an unfair advantage in the industry allowing a competitor to beat LMS's prices.  **(See Exhibit C, at ¶ 11).**

23.     For example, LMS represents Durham Manufacturing ("Durham"), a producer of steel cabinets which LMS markets and sells to retailers such as O'Reilly.  **(See Exhibit C, at ¶ 12).**

24.     LMS negotiates with O'Reilly on behalf of Durham on pricing agreements, promotions, etc.  **(See Exhibit C, at ¶ 13).**

25.     Should a competing cabinet maker have access to the confidential pricing agreement between Durham and O'Reilly, which is negotiated by LMS, the competing cabinet maker can underbid Durham to O'Reilly and effectively eliminate sales of Durham's cabinets by O'Reilly stores, resulting in a loss of profit for both Durham and LMS, who receives commission from the sale of Durham cabinets.  **(See Exhibit C, at ¶ 14).**

## LMS's Confidential and Proprietary Information

26.     LMS has invested considerable time and money creating and developing client relationships and confidential and proprietary information relating to its marketing, sales, and service to its manufacturer clients and retail customers.  **(See Exhibit C, at ¶ 15).**

27.     This information includes LMS's confidential pricing agreements, policies, promotions and discounts, customer orders and purchases, promotional tools, information

concerning the particular needs, preferences, and interests of manufacturer clients and wholesale customers (and how LMS uses such information to maintain a competitive advantage).  **(See Exhibit C, at ¶ 16).**

28.  LMS has also been entrusted with its manufacturer clients' business and marketing plans, strategies, promotions, and financial information which are also highly confidential and proprietary in nature. **(See Exhibit C, at ¶ 16).**

29.  This information is not known to persons outside of LMS and its manufacturer clients and could only be learned, if at all, through the expenditure of considerable time, effort, and expense.  **(See Exhibit C, at ¶ 17).**

30.  The confidential nature of this information provides LMS a competitive advantage in the marketplace of wholesale customers. **(See Exhibit C, at ¶ 18).**

31.  Accordingly, LMS restricts access to such information to those employees who need the information to perform their job duties for LMS. **(See Exhibit C, at ¶ 19).**

## Pepper's Employment With LMS And Negotiations To Sell The Business

32.  In May 2013, Pepper was hired by LMS to serve as a sales and marketing representative.  **(See Exhibit C, at ¶ 20).**

33.  Prior to working for LMS, Pepper had sales experience, but had no knowledge about the operation or function of a manufacturer's representative agency or the business model that LMS operates under. **(See Exhibit C, at ¶ 21).**

34.  After his employment began, Pepper approached LMS's owner and operator, Launius, and indicated he wanted to learn the manufacturer representative business with the intention of purchasing the business from Launius, who intended to retire in the next few years. **(See Exhibit C, at ¶ 22).**

7

35.     Launius then began teaching Pepper the manufacturer's representative business, in addition to paying Pepper to handle sales tasks for LMS, and the parties began negotiations for the eventual sale of LMS to Pepper.  **(See Exhibit C, at ¶ 23).**

36.     As a sales representative, Pepper was responsible for meeting with LMS's existing manufacturer clients and wholesale customers, maintaining client and customer relationships, and handling customer orders, concerns and complaints. **(See Exhibit C, at ¶ 24).**

37.     As part of LMS's agreement to negotiate the sale of LMS to Pepper, LMS also provided Pepper with unfettered access to LMS's business operations, gave him access to current manufacturer client accounts in order to conduct sales under established pricing agreements, promotions and discounts, provided Pepper with networking opportunities within the industry, and provided him with access to LMS's confidential and proprietary information.  **(See Exhibit C, at ¶ 25).**

38.     Following the agreement to negotiate the sale of LMS to Pepper, Launius provided Pepper with considerable training and shared with him the knowledge and experience gained by Launius over decades of work in the manufacturer representative business.  **(See Exhibit C, at ¶ 26).**

39.     As a sales employee, Pepper performed adequately and was compensated generously with 1/3 of the commissions earned by LMS as a whole, not just the commissions Pepper himself earned. **(See Exhibit C, at ¶ 27).**

40.     Over the next year, Launius and Pepper engaged in regular open discussion regarding the sale of the business, with more formal negotiation sessions taking place in the six months prior to Pepper's resignation. **(See Exhibit C, at ¶ 28).**

41.     As recently as mid-July 2015, the parties met to discuss Pepper's latest proposals to purchase LMS.  **(See Exhibit C, at ¶ 29).**

42.     On this date, Pepper presented Launius with additional information he needed for the purchase of LMS and his last written proposal for the terms of the purchase.  **(See Exhibit C, at ¶ 29).**

43.     Launius agreed to do everything Pepper asked and to help Pepper with the transition.  **(See Exhibit C, at ¶ 30).**

44.     Although the parties continued to meet and negotiate terms regarding the sale of LMS, Pepper informed LMS employee Harris that he did not think they would reach a deal and he was working on a backup plan, which included soliciting LMS's existing manufacturer clients to sever their contracts with LMS in order to work with Pepper. **(See Exhibit D, Affidavit of Lori Harris, attached hereto, at ¶¶ 10-13).**

### Pepper's Voluntary Termination Of His Employment With LMS

45.     Rather than finalize the terms of the sale discussed by Pepper and Launius and verbally agreed upon, on July 21, 2015, Pepper voluntarily terminated his employment with LMS effective immediately. **(See Exhibit C, at ¶ 30).**

46.     In his resignation letter, left on the desk of Launius prior to the open of business on July 21, 2015, Pepper indicated he was also ceasing negotiations for the purchase of LMS. **(See Exhibit D, at ¶¶ 2-6; Exhibit C, at ¶ 31).**

47.     Pepper terminated his employment with LMS to open his own business, Apex Sales & Marketing, Inc., also located in Millstadt, Illinois.  **(See Exhibit D, at ¶ 5; See Exhibit C, at ¶ 32).**

48.     Apex is a direct competitor of LMS, competing for manufacturer clients and wholesale customers in the areas of Southern Illinois, Missouri, Iowa, Nebraska and Kansas. **(See Exhibit D, at ¶ 6; Exhibit C, at ¶ 33).**

## Events Giving Rise To This Action

49.     On July 21, 2015, Harris arrived to open LMS for business at approximately 9:00a.m. to find Pepper's resignation letter on Launius' desk and all of Pepper's personal belongings removed from his office. **(See Exhibit D, at ¶ 3).**

50.     Upon further inspection, Harris discovered that Pepper had also deleted files from the computer provided to Pepper to conduct LMS business and, upon information and belief, may have accessed Harris' computer without LMS's authorization. **(See Exhibit D, at ¶ 4).**

51.     Upon information and belief, Pepper had planned to leave LMS and begin his competing business for many months prior to the date of his resignation. **(See Exhibit D, at ¶ 5).**

52.     Consequently, LMS hired IT and forensic professionals to determine what computer files and information Pepper downloaded from LMS's computers and databases. **(See (Exhibit D, at ¶ 7; See Exhibit C, at ¶ 34; See Exhibit E, Affidavit of Brian Koberna, attached hereto, at ¶ 2).**

53.     The forensic computer search revealed the following information:

     a.    Between the months of January and March 2015, Pepper transferred hundreds of computer files to a personal cloud storage through Microsoft One Cloud, including but not limited to, order and sales histories, customer contact information, confidential pricing information, and

product line marketing materials concerning one of LMS's largest customers, O'Reilly, which, upon information and belief, is still accessible to Pepper to date. **(See Exhibit D, at ¶ 8a; See Exhibit E, at ¶ 4a).**

b.    On or about April 30, 2015, Pepper sent LMS customer lists and contact information from his LMS email account to a private business email account, specifically, to david@apexsales.biz. **(See Exhibit D, at ¶ 8b; See Exhibit E, at ¶ 4b).**

c.    As early as May 27, 2015, Pepper was communicating with LMS customers through the private business email account, david@apexsales.biz. **(See Exhibit D, at ¶8c; See Exhibit E, at ¶4c).**

d.    On or about July 17, 2015, Pepper created a compressed file, entitled ASET.zip, which was used to access and store hundreds of computer files related to LMS's business, including, but not limited to, order histories, customer contact information, sales histories, customer invoices, confidential pricing information, and product line marketing materials. **(See Exhibit D, at ¶8d; See Exhibit E, at ¶4d).**

e.    On or about July 21, 2015, the day of Pepper's resignation, at approximately 7:11a.m., Pepper deleted approximately 100 computer files. **(See Exhibit D, at ¶8e; See Exhibit E, at ¶4e).**

54.    LMS did not authorize Pepper to download, upload or otherwise preserve access to any of LMS's computer files and documents, or those related to LMS's business, to be maintained after his employment or used for any purpose other than through his employment with LMS. **(See Exhibit C, at ¶ 35).**

55.     Any action by Pepper to access, download, upload or otherwise maintain LMS's computer files and documents beyond that required of his employment with LMS was done so without authorization or by exceeding the authorization granted to him. **(See Exhibit C, at ¶ 35)**

56.     In addition to downloading and taking hundreds of confidential and proprietary computer files and documents related to LMS's business operations, LMS discovered Pepper took additional steps to secure his own business many months prior to his resignation, despite the appearance of negotiations with LMS for the purchase of the business. **(See Exhibit D, at ¶9).**

57.     Pepper used his LMS email to submit corporate name availability inquiries to the Illinois Secretary of State in January 2015. **(See Exhibit D, at ¶9).**

58.     During the months leading up to his resignation, Pepper had also approached and solicited LMS's current manufacturer clients to sever their contracts with LMS in order to work with Pepper. **(See Exhibit D, at ¶11).**

59.     In approximately May or June, just prior to Pepper's resignation, one of LMS's manufacturer clients mentioned to Harris that Pepper had approached the company about leaving LMS to work with Pepper. **(See Exhibit D, at ¶12).**

60.     When Harris confronted Pepper, Pepper confirmed that it was true, he was working on a back-up plan in case negotiations for the purchase of LMS fell through, and he thought most of LMS's clients would go with him.   **(See Exhibit D, at ¶13).**

61.     Upon information and belief, Pepper took action to induce LMS's current manufacturer clients to sever contracts with LMS prior to his resignation.   **(See Exhibit D, at ¶14).**

62.     Upon information and belief, Pepper made agreements to represent at least four (4) of LMS's current clients prior to his resignation. **(See Exhibit C, at ¶¶ 36, 37).**

63.     As a result of Pepper's actions taken prior to his resignation from LMS, LMS lost the following manufacturer contracts:

     a.   On or about May 1, 2015, manufacturer Reading Technologies, Inc. ("RTI") provided notice that it was terminating its contract with LMS; upon information and belief, Pepper is now the representative of record for RTI.

     b.   LMS maintained a contractual relationship with RTI for approximately nine (9) months prior to the sudden termination of the contract on or about May 1, 2015.

     c.   On or about July 21, 2015, manufacturer Motor Vac/CPS ("CPS") provided notice that it was terminating its contract with LMS, informing LMS that "we have already decided to go with David [Pepper]."

     d.   LMS maintained a contractual relationship with CPS for approximately eleven (11) months prior to the sudden termination of the contract on or about July 21, 2015.

     e.   On or about July 23, 2015 and July 24, 2015, the manufacturer Automotive Spray Equipment Technologies ("ASET") lines of Iwata and Bonding Solutions provided notice that it was terminating its contract with LMS; upon information and belief, the Iwata and Bonding Solutions lines are now represented by Pepper.

     f.   LMS maintained a contractual relationship with Iwata for approximately one (1) year prior to the sudden termination of the contract on or about July 23, 2015.

g. LMS maintained a contractual relationship with Bonding Solutions for approximately nine (9) months prior to the sudden termination of the contract on or about July 24, 2015; shortly thereafter, Launius was informed LMS by a Bonding Solutions employee that Pepper was now their representative.

h. LMS also lost the exclusive right to represent the "One-Shot" product line which LMS had acquired through ASET and was awaiting finalization of the contract; upon Pepper's resignation, LMS discovered ASET had presented the contract to Pepper some time earlier and Pepper had failed to provide the contract to Launius for inspection and signature.

i. Upon information and belief, Pepper is now the representative of record for ASET's "One-Shot: product line.

**(See Exhibit C, at ¶ 37).**

64.     On July 21, 2015 at 11:05a.m., immediately following his resignation, Pepper logged into the O'Reilly portal system (to which he could access only as an employee of LMS) and changed LMS's contact information for two of LMS's manufacturer clients to his own cell phone number and new business email address, directing any O'Reilly store seeking product from two of LMS's current manufacturer clients to contact Pepper instead of LMS. **(See Exhibit D, at ¶15).**

65.     On July 22, 2015, Pepper emailed LMS's current clients and customers, stating, "Hello all, Please update the email address you have for me to reflect this new one. My cell number is still the same, just the Company, Email and address has changed slightly." **(See Exhibit D, at ¶16).**

66.     Since Pepper's resignation, LMS discovered Pepper routinely failed to share with LMS information and correspondence he had with current and prospective clients during his employment regarding a variety of matters, including customer complaints, concerns, and questions.  **(See Exhibit C, at ¶ 39).**

<u>**COUNT I**</u>

<u>**VIOLATION OF THE COMPUTER FRAUD AND ABUSE ACT, 18 USCA § 1030 *et seq***</u>

67.     LMS hereby realleges and incorporates the allegations set forth in paragraphs 1 through 66 above as through specifically set forth herein.

68.     LMS maintains computers, hard drives, email servers and network used to conduct interstate communications and commerce which are protected computers within the meaning of the Computer Fraud and Abuse Act. 18 USCA § 1030 *et seq.*

69.     On or about July 21, 2015, LMS became aware that, based upon information and belief, Pepper had intentionally deleted LMS computer files from his business computer and accessed without authorization the stored electronic information and communications store on LMS's computer.

70.     Pepper's conduct intentionally and recklessly caused damage and loss to LMS.

71.     To date, LMS has expended in excess of $5,000 to investigate and respond to Pepper's offenses and unauthorized access to LMS's computers, hard drives, email servers and network, including the engagement of IT professional and a computer forensic firm to conduct an investigation of the unauthorized activity by Pepper.

WHEREFORE, LMS requests this Court grant appropriate temporary, preliminary and permanent injunctive relief; enter judgment against Pepper; award compensatory damages in an

amount to be proven, as well as punitive damages; award LMS prejudgment interest, costs, and attorneys' fees; and grant such further relief that the Court may deem just and proper.

## COUNT II

## BREACH OF ILLINOIS TRADE SECRETS ACT, 764 ILCS 1065/1 et seq

72.     LMS hereby realleges and incorporates the allegations set forth in paragraphs 1 through 71 above as through specifically set forth herein.

73.     This is an action against Pepper pursuant to the Illinois Trade Secrets Act, 764 ILCS 1065/1 *et seq.*

74.     Upon information and belief, while working for LMS, Pepper gained access to LMS's trade secrets, including but not limited to the names, buying habits, needs, practices of, and other information about, LMS's customers; the costs, prices, promotions, discounts, commissions, and profit margins it obtains or has obtained or at which it purchases or has purchased or sells or has sold its products or services; lists and other records, both written and stored on other media and devices, used in its business; and other confidential and trade secret information about or concerning the business of LMS which has been certified by LMS over many years.

75.     LMS derives independent economic value, actual or potential, from those trade secrets not being generally known to, and not being readily accessible by proper means by, other persons who can obtain economic value from their disclosure or use.

76.     LMS took reasonable efforts to maintain the secrecy of its trade secrets.

77.     Upon information and belief, Pepper has misappropriated without authorization, and/or used or disclosed, and/or inevitably will use or disclose, LMS's trade secrets, which he wrongfully obtained and retained by downloading such information following the termination of the employment relationship with LMS, for example, without limitation, as follows:

a.      Information from LMS's confidential and proprietary and customer database and files, including:

- The names of LMS manufacturers, customers and prospects (including accounts that Pepper called upon during his employment with LMS);

- The types of equipment and materials purchased by LMS wholesale customers and prospects from LMS manufacturer clients (including accounts that Pepper called upon during his employment with LMS);

- The frequency of purchases by LMS wholesale customers and prospects from LMS manufacturer clients (including accounts that Pepper called upon during his employment with LMS);

- The identities of the manufacturer sources for LMS wholesale customers (including accounts that Pepper called upon during his employment with LMS);

- Amounts of purchases, pricing agreements, policies, promotions and discounts, and profit margins for LMS manufacturer clients, wholesale customers and prospects (including accounts that Pepper called upon during his employment with LMS);

- The types of products/services provided to LMS manufacturer clients, wholesale customers and prospects (including accounts that Pepper called upon during his employment with LMS);

- Account notes for LMS manufacturer clients, wholesale customers and prospects (including accounts that Pepper called upon during his employment with LMS);

- Identities of contact persons and competitive providers for LMS manufacturer clients, wholesale customers, and prospects;

b.    LMS contracts and agreements with manufacturer clients and wholesale customers (including accounts that Pepper called upon during his employment with LMS);

c.    Emails and correspondence between Pepper and LMS manufacturer clients, wholesale customers and prospects during his employment with LMS, including emails that he forwarded to his personal email accounts and/or personal business email account, related to contracts, sales, manufacturer clients, wholesale customers, and prospect lists, identities of manufacturer clients, wholesale customers, and prospect contact persons, pricing information, and other information;

d.    Written contracts or agreements between manufacturer clients and wholesale customers and/or LMS (including accounts that Pepper called upon during his employment with LMS) which reflect information about products, equipment, pricing, payments, agreement duration, and other data;

78.    Pepper has acted without LMS's consent, and knew or had reason to know that his knowledge of such trade secrets was acquired under circumstances giving rise to a duty to maintain their secrecy.

79.    Pepper has failed and refused to take sufficient, demonstrable steps to prevent misappropriation of LMS's trade secrets despite LMS's written demands for Pepper and cease and desist **(see Exhibit A, attached hereto)**; on the contrary, Pepper has refused to acknowledge

18

his actions and demonstrated an unwillingness to preserve the confidentiality of LMS's trade secrets **(see Exhibit B, attached hereto)**.

80.     Pepper's actual and threatened misappropriation of LMS's trade secrets is outrageous because of Pepper's evil motive or reckless indifference to LMS's rights.

81.     Pepper's actions and omissions as alleged herein have directly and proximately cause LMS to suffer damages and irreparable harm in the loss of manufacturer client contracts, loss of wholesale customers, loss of business goodwill, loss of competitive advantage and loss of business.

82.     All conditions precedent to the maintenance of this action have been satisfied or waived.

WHEREFORE, LMS requests this Court grant appropriate temporary, preliminary and permanent injunctive relief; enter judgment against Pepper; award compensatory damages in an amount to be proven, as well as punitive damages; award LMS prejudgment interest, costs, and attorneys' fees; and grant such further relief that the Court may deem just and proper.

## COUNT III

## BREACH OF DUTY OF LOYALTY

83.     LMS hereby realleges and incorporates the allegations set forth in paragraphs 1 through 82 above as though specifically set forth herein.

84.     As an employee of LMS, Pepper owed LMS a duty of loyalty.

85.     Pepper violated this duty of loyalty by a variety of actions while still in the employ of LMS, including, without limitation:

        a.     Downloading and/or emailing to his personal email or personal business email confidential and trade secret information belonging to LMS while still employed with LMS;

b.     Retaining confidential and trade secret information belonging to LMS after the termination of the employment relationship;

c.     Using LM's confidential and trade secret information to compete with LMS;

d.     Establishing a competing business, specifically Apex Sales & Marketing;

e.     Attempting to induce and/or actually inducing LMS's manufacturer clients to sever their relationship with LMS;

f.     Negotiating contracts with LMS's manufacturer clients to conduct business in direct competition with LMS after the termination of the employment relationship.

86.     Pepper's conduct caused LMS damages in an amount to be proven at trial.

87.     Pepper's conduct was outrageous because of his evil motive or reckless indifference to LMS's rights.

WHEREFORE, LMS requests this Court grant appropriate temporary, preliminary and permanent injunctive relief; enter judgment against Pepper; award compensatory damages in an amount to be proven, as well as punitive damages; award LMS prejudgment interest, costs, and attorneys' fees; and grant such further relief that the Court may deem just and proper.

## COUNT IV

## TORTIOUS INTERFERENCE WITH CONTRACT OR BUSINESS EXPECTANCY

88.     LMS hereby realleges and incorporates the allegations set forth in paragraphs 1 through 87 above as though specifically set forth herein.

89.     LMS had contracts with, or valid business expectancies from, manufacturer clients, wholesale customers, or prospects whom Pepper called upon when he was employed by

20

LMS, including, but not limited to, contracts with Reading Technologies, Inc., CPS Automotive Automotive Spraying Equipment Technologies, LLC, Iwata, Bonding Solutions, and One-Shot.

90.     Pepper had knowledge of LMS's contracts and/or business expectancies with these businesses.

91.     While employed with LMS and after termination of the employment relationship, Pepper intentionally and without legal justification interfered with those contracts and/or business expectancies by inducing or causing a those businesses to breach their contracts with LMS.

92.     There was an absence of justification for Pepper's conduct.

93.     Pepper's conduct caused LMS damages.

94.     Pepper's conduct was outrageous because of his evil motive or reckless indifference to LMS's rights.

WHEREFORE, LMS requests this Court grant appropriate temporary, preliminary and permanent injunctive relief; enter judgment against Pepper; award compensatory damages in an amount to be proven, as well as punitive damages; award LMS prejudgment interest, costs, and attorneys' fees; and grant such further relief that the Court may deem just and proper.

## COUNT V

## VIOLATION OF ILLINOIS UNIFORM DECEPTIVE TRADE PRACTICES ACT

95.     LMS hereby realleges and incorporates the allegations set forth in paragraphs 1 through 94 above as though specifically set forth herein.

96.     Pepper, by altering the LMS contact information in the O'Reilly database to that of his own, attempted to pass off his services as that of another and/or created a likelihood of confusion or misunderstanding as the source, sponsorship, approval or certification of goods or services and/or represented that goods or services have sponsorship or approval that they do not

have or that Pepper has a sponsorship, approval status, affiliation, or connection that he does not have and/or engaged in conduct which creates a likelihood of confusion or misunderstanding in violation of Illinois' Uniform Deceptive Trade Practices Act, 815 ILCS 510/1, et seq. ("UDTPA").

97.     Pepper's actions described above created a likelihood of confusion or misunderstanding.

98.     Pepper's actions described above were deliberate and willful.

99.     Pepper's actions described above were taken with a design to harm LMS's reputation or business.

100.    There was an absence of justification for Pepper's conduct.

101.    Pepper's conduct was outrageous because of his evil motive or reckless indifference to LMS's rights.

WHEREFORE, LMS requests this Court grant appropriate temporary, preliminary and permanent injunctive relief; enter judgment against Pepper; award compensatory damages in an amount to be proven, as well as punitive damages; award LMS prejudgment interest, costs, and attorneys' fees; and grant such further relief that the Court may deem just and proper.

## VERIFICATION

I, William E. Launius, Sr., pursuant to 28 U.S.C. § 1746, state as follows:

1. I am the owner of Launius Marketing Specialists, Inc. in Millstadt, Illinois. I have personal knowledge of the matters alleged in the Verified Complaint through my employment and am competent to testify to all matters stated therein.

2. I have read Launius Marketing Specialists, Inc.'s Verified Complaint and the factual allegations contained therein are true and correct to the best of my knowledge, information and belief.

I declare under penalty of perjury that the foregoing is true and correct.

Executed on this 21st day of September, 2015.

_____
Bill Launius, Sr.

23

Respectfully Submitted,

McMAHON BERGER, P.C.


/s/ Michelle M. Cain
Michelle M. Cain, IL06197837
Kevin J. Lorenz  (*Pro Hac Vice* Pending)
Christina S. Capizzi (*Pro Hac Vice* Pending)
2730 North Ballas Road, Suite 200
P.O. Box 31901
St. Louis, Missouri  63131-3039
(314) 567-7350 – Telephone
(314) 567-5968 – Facsimile

Attorneys for Plaintiff